IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| CLIFTON KELLY BRUMFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 12-3033-CV-S-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Clifton Kelly Brumfield seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) discounting the opinion of his treating physicians and deriving a residual functional capacity that is not supported by the evidence, (2) failing to contact Dr. Roston and consultative examiner Dr. Kreymer to clarify their opinions, and (3) discrediting plaintiff's subjective complaints. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

I.      BACKGROUND

On February 16, 2010, plaintiff applied for disability benefits alleging that he had been disabled since July 1996. His alleged onset date was amended to September 18, 2008. Plaintiff's disability stems from back and neck pain, high blood pressure and depression. Plaintiff's application was denied on May 5, 2010. On April 12, 2011, a hearing was held before an Administrative Law Judge. On June 21, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On November 18, 2011, the Appeals Council denied

plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

2

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

3

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Susan Brooks, in addition to documentary evidence admitted at the hearing.

## A.    SUMMARY OF TESTIMONY

During the April 12, 2011, hearing, plaintiff testified; and Susan Brooks, a vocational expert, testified at the request of the ALJ.  Plaintiff originally claimed an onset of disability in July 1996; however, it was amended to September 18, 2008, during the hearing since plaintiff worked after July 1996 (Tr. at 34).  Plaintiff filed a previous application for disability benefits in 2004 which was denied (Tr. at 35).

## 1.    Plaintiff's testimony.

Plaintiff was 48 years of age at the time of the hearing (Tr. at 37).  He has a tenth grade education and did not earn a GED (Tr. at 37).  Plaintiff was married but had been separated for four years (Tr. at 37).  He had been living with his mother for the past three months, and prior to that he lived in a building formerly used for a store (Tr. at 37-38).

On July 10, 1996, plaintiff was in a car accident and injured his left leg, his neck, his ribs and his cheekbone (Tr. at 55). The most serious injury was his left hip and leg (Tr. at 55).  He had surgery to sew his kneecaps back on (Tr. at 55).  He had a titanium rod in his left leg and he had a screw that was sticking too far through and was cutting into his pelvis (Tr. at 56).  It was making him fall, so six months after the original surgery he had another surgery to remove the screw (Tr. at 56).  He continues to have the fluid drained off his knees, with the last time being three or four years ago (Tr. at 56).

4

Plaintiff hurt his neck when he was 14 and got a collar for it, and he used the collar again after this car accident (Tr. at 57). He has always had trouble with his neck and back (Tr. at 57). When he lived in Montana, he was told by a pain specialist that he needed "severe work done that is for trauma patients in wrecks and stuff," but he moved to Missouri before he ever got anything done (Tr. at 58). Plaintiff was taking Prozac at the time which was about four years earlier (Tr. at 58). The Montana Migrant Farm Council doctor prescribed it (Tr. at 58). Plaintiff was doing seasonal work in Montana in 2008 (Tr. at 59). When he did construction work, he rarely had a 40-hour work week because of the weather and "moving back and forth from job to job." (Tr. at 59). Plaintiff said he cannot remember the last time he had a full 40-hour paycheck (Tr. at 59). When he worked for the potato company, he worked about 30 hours a week because that was all the work that was available (Tr. at 70). Plaintiff was a supervisor of the migrant workers and he also was in charge of making sure everything mechanical was working properly (Tr. at 70-71).

Plaintiff does not have a driver's license (Tr. at 38). Friends and family take him places (Tr. at 38). On September 18, 2008, plaintiff was working as a carpenter, but has not worked since that date (Tr. at 38-39). Plaintiff can read blueprints (Tr. at 39).

On September 18, 2008, plaintiff fell off a ladder at work (Tr. at 39). He did not file a worker's compensation claim because his employer did not have insurance on him (Tr. at 39). Plaintiff went up a ladder carrying approximately 75 pounds of tools (Tr. at 40). He fell approximately 15 feet off the ladder, landing on his feet which broke his right foot and twisted his ankle (Tr. at 40). His neck was severely jammed, he tore a bunch of muscles and ligaments between his shoulders and his neck, and it "tore [his] lower back up pretty good" (Tr. at 40). Despite this testimony, plaintiff then said, "[M]y right foot, it still bothers me. They said it wasn't broke, but...." (Tr. at 40). Plaintiff went to the emergency room and was offered pain

5

pills but no other treatment (Tr. at 40). At the time of the hearing, he was taking only a "mild, non-narcotic pain pill" (Tr. at 41). The doctor whom plaintiff goes to cannot prescribe narcotics (Tr. at 41). For the past year and a half plaintiff had been taking a "light non-narcotic with a muscle relaxer and an anti-inflammatory all together" (Tr. at 41).

Plaintiff's pain is excruciating, and it gets so bad that it makes him physically sick (Tr. at 41). When that happens, he puts a wet rag on his forehead, tries to move around a little and get in a good spot to take the pressure off (Tr. at 41-42). Plaintiff has a cane at home, but it was not prescribed (Tr. at 42). He has a back brace that was prescribed "years back" (Tr. at 42).

Plaintiff's right ankle has healed, but the right side of it still burns and it hurts to walk on it sometimes (Tr. at 42). His doctor believes it may be nerve damage, and he plans to show the MRIs to a specialist when he goes to one (Tr. at 42).

Plaintiff has constant pain in his lower back and between his shoulders (Tr. at 43). The pain radiates into his legs and they go numb (Tr. at 43). His left leg is always kind of numb and he has "real bad muscle spasms" (Tr. at 43). The radiating pain and numbness occur often (Tr. at 43). Plaintiff said, "If I make a wrong move or step wrong or turn wrong, I am liable to go down." (Tr. at 44). The last time plaintiff fell because of his legs was two days before the hearing (Tr. at 44). Plaintiff falls a couple times a week (Tr. at 44). Again he said his doctor believes he has nerve damage and arthritis (Tr. at 44-45). He identified his doctor as Sheila Wyman; however, she is a nurse, not a doctor (Tr. at 45). In the past year and a half, plaintiff had not been to an orthopedic specialist (Tr. at 45).

Plaintiff was asked about his alcohol consumption; he said he does not drink very much because he cannot afford it (Tr. at 46-47). He used to drink a lot to numb his pain (Tr. at 47). He would easily drink a 12-pack of beer every day (Tr. at 47). Plaintiff was asked when he

stopped doing that, and he said it was a couple years after the automobile accident which was on July 10, 1996 (Tr. at 47). He was questioned about more recent usage, and he admitted that in 2008 he started working and he drank pretty heavily on the weekends, "but it's kind of a no-no through the week, you know." (Tr. at 47-48). At the time of the hearing, plaintiff continued to drink eight or nine beers at a time on the weekends, but he said that does not get him intoxicated (Tr. at 48). "I won't be falling down or nothing, you know, stupid." (Tr. at 48). Plaintiff takes medication while he consumes that much alcohol (Tr. at 48).

Plaintiff is not seeing a mental health provider (Tr. at 49). He saw Dr. Kreymer for a mental evaluation after his attorney referred him (Tr. at 49). Plaintiff said his attorney referred him for the evaluation because he was experiencing depression and anxiety (Tr. at 49). He felt worthless and could not work, and he did not like that he had to depend on others for the first time in a long time (Tr. at 49). His symptoms were nervousness, he did not want to eat, he did not like being in towns, he quit going to family functions because he did not feel comfortable there anymore (Tr. at 50). Plaintiff never asked for the results of his evaluation (Tr. at 50). He said Dr. Kreymer said he did not think plaintiff needed therapy and thought plaintiff was dealing the best he could with medications, so plaintiff figured that is what the results of the evaluation would say (Tr. at 50). Plaintiff was taking Pristiq (treats depression), Buspar (treats anxiety) and Seroquel (treats bipolar disorder and major depressive disorder), all of which were prescribed by Ms. Wyman (Tr. at 50-51). Plaintiff saw Dr. Kreymer twice for his evaluation (Tr. at 51). The first time was to get his medical card from the Health Department, and the second time was for his disability case (Tr. at 52).

Plaintiff described his typical day as follows: He gets up and has a cup of coffee and watches the weather on television (Tr. at 52). He sits for a bit then gets up to walk around a little bit. He then will fix something to eat for breakfast. Plaintiff is able to shop at a small

7

grocery store -- there is no Walmart near by (Tr. at 52-53). He helps with dishes, but bending over the sink hurts his back (Tr. at 53). He cooks a little and wipes off the stove, he keeps the coffee pot filter clean (Tr. at 53). He can bathe and dress himself (Tr. at 53). He can use a Swiffer to sweep the floor but does not bend over to pick up the debris, he just sweeps it into a corner (Tr. at 53). Plaintiff goes fishing but the place he goes does not require much walking (Tr. at 54). "You know, I can't be crawling around up and down banks or something. It has to be easily accessible." (Tr. at 54). He would fish with his buddy, but they have not gone lately because his buddy is suffering from cancer and has not felt up to it (Tr. at 54).

Plaintiff hangs around with Jimmy Tate the most (Tr. at 65). They do a lot of things together (Tr. at 65).

Plaintiff can sit for 15 to 20 minutes at a time (Tr. at 54). He can stand for 30 minutes at a time (Tr. at 54, 67). When asked whether he could sit and stand throughout the day, he said, "Well, that's what I do." (Tr. at 54). When asked whether he lies down during the day, plaintiff said, "Sometimes I stretch out just to get weight off my feet, if they start swelling." (Tr. at 54). He does that for 30 to 40 minutes (Tr. at 54). Plaintiff can lift 20 pounds (Tr. at 55). He can walk about 150 feet at a time (Tr. at 65). Then he would need to rest for two or three hours before walking again (Tr. at 66). Plaintiff does not exercise (Tr. at 66). The majority of his day is spent watching television (Tr. at 55). Plaintiff was asked how long he could sit and concentrate and be able to work, and he said maybe 30 minutes (Tr. at 66). He could not do that for eight hours a day because he gets frustrated pretty easily (Tr. at 66). When asked if he would have any problems with pain during that time, plaintiff said, "Yeah. It aggravates me and then I get mad and I don't think very straight a lot of the time, so I wouldn't be getting much work done." (Tr. at 66). Plaintiff's problems with sitting and standing are caused by his knees and his back and his hip (Tr. at 67-68).

8

Plaintiff complained of tinnitus in his right ear and he plans to get an appointment with a specialist about that (Tr. at 60). He is having problems seeing up close, but at the time he was using only reading glasses (Tr. at 60). Plaintiff has seen a nurse practitioner about these issues (Tr. at 60-61). The nurse practitioner works for Dr. Roston who has been plaintiff's family doctor since he was six years old, but he has not seen him lately (Tr. at 61). Plaintiff last saw Dr. Roston three and a half years ago (Tr. at 61). At the time his blood pressure was "going crazy" (Tr. at 61). Plaintiff takes medication for high blood pressure, a condition which causes chest pains, dizziness, and a half a dozen hospitalizations (Tr. at 61-62). He has been at "stroke level" 15 times (Tr. at 62). When plaintiff's blood pressure is high, he feels like he is having a heart attack, he gets bad headaches, he sweats and gets dizzy (Tr. at 62). "Last fall" was the last time he felt like that and it occurred in Nurse Wyman's office, so his prescription dosage was doubled (Tr. at 62).

Plaintiff has had walking pneumonia three or four times and he uses an inhaler and a breathing treatment (Tr. at 62-63). Although plaintiff's attorney stated that plaintiff has tuberculosis, plaintiff was unaware of that diagnosis (Tr. at 62-64). Plaintiff was just told that he had hardening in his left ventricle and down the line he will have problems with his heart; however, he has not been to a doctor about that (Tr. at 63-64).

Plaintiff has no income (Tr. at 64). He gets food stamps (Tr. at 64). Plaintiff's mother buys beer for him and allows him to drink in her house, but she does not like him drinking (Tr. at 64). Plaintiff last used in drugs in approximately 1998 (Tr. at 65).

Plaintiff was asked to explain why he cannot do a sedentary job:

Well, I have anxiety attacks. I get frustrated real easy. If I don't know how to pronounce a lot of words and I don't know what a lot of words even mean. So, I don't know. I can't even spell right and my math is, for sure, no good. I get mad. I can't concentrate and I get mad and I just give up. I have to go to the bathroom a lot. I just don't have the attention span to sit and concentrate on something. If I try to read too

9

much, I get a headache anyhow.  My eyes, you know.  That's about all I get on the sitting and doing something part.  As far as picking up anything, I couldn't even pack my tool belt while I was in it. That weighed 50 pounds at any given time with all of the tools in it.  You can get another 15 pound of nails in it and that adds weight to your back, hips, and your knees all day long.  I couldn't do that no more, for sure.  And, my hands bother me.  I can't hang onto a hammer like I used to, so that would probably be very dangerous for somebody on the side of me.  I just can't do what I used to do.  There is no way.  I try and then I pay for it for two or three days.  I have been down and I am by myself and I can hardly even get up to go to the bathroom.  It's not fun.  So, I have to pay attention to things that I do, or I will be in trouble. Especially, being by myself with no phone, you know.  That bothers me. That irritates me, too.  I don't know.

(Tr. at 68-69).

## 2.    Vocational expert testimony.

Vocational expert Susan Brooks testified at the request of the Administrative Law Judge.

Plaintiff previously worked as a carpenter which is medium skilled work with an SVP of 4[1] (Tr.

at 71, 72).  He was a farm worker which is medium unskilled with an SVP of 2 (up to 30 days

to learn the job).

The first hypothetical involved a person who could sit for six hours, stand and walk

four to six hours, lift and carry 20 pounds occasionally and 10 pounds frequently.  The person

could frequently handle, finger, feel and reach with his upper extremities; occasionally crawl,

squat, stoop, bend or climb; could never climb ladders or work at heights.  The person could

concentrate for an extended period of time, would respond appropriately to routine changes in

a work environment, and could only perform simple repetitive tasks (Tr. at 72).  The

vocational expert testified that such a person could not perform plaintiff's past relevant work,

but the person could be an inspector, DOT 727.687-054, with 1,100 positions in Missouri and

---

[1]"Specific Vocational Preparation," SVP is the amount of time needed to learn the techniques, acquire the information, and develop the facility for average performance in a specific job-worker situation.  SVP comes from vocational education, civilian, military, and institutional work experience, apprenticeship, and from in-plant and on-the-job training.  An SVP of 4 means it takes about three to six months to learn to do the job.

10

62,000 in the United States; a garment sorter, DOT 222.687-014, with 2,500 positions in Missouri and 109,000 in the country; or a cashier II, DOT 211.462-010, with 1,900 positions in Missouri and 91,000 in the United States (Tr. at 73). In the experience of the vocational expert, these positions would have a sit/stand option or limited standing, which are not addressed by the Dictionary of Occupational Titles (Tr. at 73-74). These jobs are all light and unskilled (Tr. at 74).

The second hypothetical involved a person who would have to sit for 15 minutes and then stand for 15 minutes (Tr. at 74). That would not affect the ability to do the above jobs (Tr. at 74). However, if the person had to move away from the job site or not attend to the task at hand ten percent of the time or more, he would be unemployable (Tr. at 74).

If the person had to miss one day of work per month due to high blood pressure or pain, the person could still do these positions (Tr. at 75). Missing two days per month would preclude employment (Tr. at 75).

The next hypothetical involved a person who had problems dealing with people, would have to be isolated, and would have difficulty with pressure either from coworkers or a boss (Tr. at 75-76). The vocational expert testified that the question was "very nebulous" but if the person could not work with the public, he could not be a cashier but could do the other jobs (Tr. at 76). The person could also perform these jobs despite the problems with pressure, which the vocational expert interpreted to mean stress (Tr. at 76).

The next hypothetical incorporated the opinion of Dr. Roston which includes the limitation that every four hours the person would need to lie down for one hour (Tr. at 76-77). The person would not be able to work (Tr. at 77).

The next hypothetical omitted the need to lie down in Roston's written opinion but included the rest of the opinion, i.e., involved a person who could sit "four hours competitive

11

and two hours non-competitive" (Tr. at 77). The vocational expert clarified that the hypothetical involved a person who could stand and/or walk three hours and sit four hours per day (Tr. at 78). Because that amounts to less than eight hours, the vocational expert said the person could not work (Tr. at 78).

The next hypothetical incorporated the findings of Dr. Kreymer, i.e., that the person would have slight limitations on the ability to remember location and work-like procedures, slight inability to understand and remember very short and simple instructions, and slight inability to carry out very short and simple instructions (Tr. at 78). The person would have slight limitation in the ability to make simple work-related decisions and the ability to be aware of normal hazards and make appropriate precautions (Tr. at 79). "Slight" was denied as "a mild limitation in this area, but still has some useful functioning." (Tr. at 79). The person would have marked limitations -- more than moderate but less than extreme and which result in serious interference with the ability to function independently, appropriately and effectively -- in 11 areas of mental functioning (Tr. at 79-80). The vocational expert did not know what those areas were and therefore could not voice an opinion; however, the ALJ took judicial notice of the fact that such a person could not work (Tr. at 80).

At the conclusion of the hearing, plaintiff's attorney argued that plaintiff met listing 12.06 (anxiety disorders) and 12.04 (affective disorders). "I think the most serious problem that he has is his depression and anxiety, and that would prevent him from working more than his physical problems, even though he has physical problems that are documented by at least three sets of MRIs. . . . [His pain] affects his ability to stand and walk and [he] even has pain there that is chronic enough to affect his ability to sit, concentrate, and be able to perform light or even sedentary work. He would have a problem with sedentary work, primarily, because of the chronic pain that he has, even with medication. He is going to have a problem in the

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 12 of 52

record where it shows that he drinks, but it's not against the law and it hasn't affected him. That didn't affect his broken bones and problems that he has that are showing up on his MRI. So, the man is less than sedentary and, in my opinion, meets at least two grids or two listings." (Tr. at 81-82).

## B. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Plaintiff earned the following income from 1994[2] through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1994 | $4,974.25 | 2003 | $ 0.00 |
| 1995 | 2,943.10 | 2004 | 5,535.00 |
| 1996 | 3,674.37 | 2005 | 8,175.00 |
| 1997 | 432.00 | 2006 | 8,715.00 |
| 1998 | 1,063.25 | 2007 | 1,920.00 |
| 1999 | 224.00 | 2008 | 10,715.00 |
| 2000 | 0.00 | 2009 | 0.00 |
| 2001 | 1,469.00 | 2010 | 0.00 |
| 2002 | 9,306.50 | 2011 | 0.00 |

(Tr. at 155-164).

### Disability Report - Adult

In a Disability Report, plaintiff was asked to list the jobs he had held in the past 15 years (Tr. at 184-195). He reported working as a carpenter in September 2008 for 40 hours a week earning $10 an hour. He was paid in cash for this job. He worked as a carpenter from 2005 to 2006 earning $12.00 an hour working 40 hours per week. He worked as a carpenter from 2001 to 2002 earning $10,000 a year working 40 hours per week. He worked as a factory laborer in 2007 earning $1,400 per month and working 40 hours per week.

---

[2]Plaintiff was 32 years of age in 1994; however, I have found no earnings records predating 1994.

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 13 of 52

Function Report - Adult

In a Function Report dated March 1, 2010, plaintiff indicated that he lives alone in a house (Tr. at 194-204). He described a typical day as follows:

> I don't sleep very well due to my injuries. So depending on how I sleep, I get up and make coffee, watch TV. Maybe listen to my radio. Then I try and eat something, I go check my mail. Then my friend Jimmy Tate usually comes and picks me up and I go back to his house and visit most of the day. Or if I need to go to town then he or somebody takes me. Then I usually go back home watch TV, eat, and go back to bed. Due to the way I sleep.

Plaintiff reported that sometimes his knees lock up and he falls while bathing. He has no difficulty caring for his hair, shaving, feeding himself or using the toilet. Plaintiff has his friend's wife help him with paperwork, doctor appointments, etc. He prepares sandwiches, frozen dinners, and he eats with friends at their house. He is able to do dishes and he usually has a friend's wife help him with the remaining household chores. Dishes take about a half an hour to do. When asked if he needs encouragement to do household chores, he wrote, "My friends help me out a lot." He goes outside as often as he can. He is able to ride in a car, and his friends or his mother take him places. He is unable to go out alone because he does not have a car or a driver's license. He is able to shop in stores for about an hour at a time two or three times per month.

Plaintiff's hobbies are watching television, fishing, and flowers. He does these things "just fine." His friend takes him fishing. He spends time with others watching television, visiting, fishing. He has no problems getting along with family, friends, neighbors, or others. When asked to circle all of the abilities that his condition affects, plaintiff circled everything except talking and getting along with others. He has never been fired or laid off from a job due to problems getting along with other people. He does not like to be in public.

14

**Work History Report**

In a Work History Report, plaintiff reported having worked as a carpenter in 2008, a factory laborer from 2007 to 2008, a carpenter from 2005 to 2006, a carpenter from 2001 to 2002 (Tr. at 209).

## C.    SUMMARY OF MEDICAL RECORDS

On October 16, 2000, approximately eight years before his alleged onset date, plaintiff was seen at Skaggs Community Health Center complaining of elevated blood pressure and alcohol dependence (Tr. at 309-310, 313-314). Plaintiff had checked into the Sigma House three days earlier to try to break an alcohol dependence, and his blood pressure had continually risen from 172/108 to 214/113. Plaintiff's only physical complaint was mild headache. He was not taking any medications. Plaintiff had never been treated for high blood pressure in the past. He was smoking one pack of cigarettes per day. His physical exam was normal other than his blood pressure. Plaintiff was given Lopressor and Nifedipine through an IV, and was given Lopressor and Vicodin (for headache) orally. His blood pressure dropped to 146/89 which was noted as normal. On discharge he was given prescriptions for Lopressor for hypertension and Darvocet-N (narcotic) for headache.

The next day, on October 17, 2000, plaintiff returned to Skaggs Community Health Center for a recheck of his hypertension (Tr. at 311-312). His blood pressure on arrival was 194/122. His physical exam was normal other than mild headache and elevated blood pressure. He continued to smoke a pack of cigarettes per day. "The patient is an alcoholic, but he is in rehab at this time. He is widowed and unemployed." He was given IV Lopressor and his blood pressure reduced. He was prescribed additional Lopressor and Ativan (treats anxiety) for five days.

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 15 of 52

On October 18, 2000, plaintiff was seen at Skaggs Community Health Center complaining of high blood pressure for the third day in a row (Tr. at 307-308). Plaintiff had no physical symptoms other than a blood pressure of 212/106. He was on Lopressor (treats hypertension) and Ativan (treats anxiety) for his blood pressure. Plaintiff was smoking 3/4 pack of cigarettes per day and reported that he "used to drink." An EKG was normal. His blood work was normal. He was given shots of Toradol (non-steroidal anti-inflammatory) and Clonidine (treats hypertension) and was given Nifedipine (treats hypertension) orally and his blood pressure went down to 180/96 and then to 156/108. He was given prescriptions for Clonidine and Lopressor (treats hypertension) and was instructed not to eat any salt.

On October 31, 2000, plaintiff was seen at Skaggs Regional Medical Center complaining of high blood pressure (Tr. at 305-306). Plaintiff was undergoing "prolonged detox at Sigma House." Plaintiff had been sent to the emergency room due to having a blood pressure of 220/120 -- he said he would not have come to the ER had the people at Sigma House not wanted him to. He was taking Toprol XL for hypertension, Lorazepam which treats anxiety, and Clonidine for high blood pressure. He reported no back or spine pain. Plaintiff was smoking a pack of cigarettes per day. He was unemployed. He had full range of motion of his extremities. Plaintiff's liver enzymes were slightly high, but otherwise his exam was essentially normal. He was treated for his high blood pressure with Clonidine, Lopressor (also called Toprol XL), and Ativan (an anxiety medication), the latter two through his IV. His blood pressure came down to 158/98. He was told to increase his Clonidine. His discharge diagnoses were hypertension and alcoholism.

On November 8, 2000, plaintiff had blood work done which showed his ALT (SGPT) (liver enzymes) to be high (Tr. at 326).

About 14 months later, on January 11, 2002, plaintiff was seen in Dr. Roston's office and reported he had not had alcohol for the past three months but had stopped taking his two blood pressure medications (Tr. at 317, 323). His blood pressure was 160/110.

On January 25, 2002, plaintiff was seen in Dr. Roston's office; his blood pressure was 156/96 (Tr. at 317, 323). He reported the Lorazepam (treats anxiety) did not help his nerves. He had no neck or back pain.

More than two years later, on April 20, 2004, plaintiff was seen in Dr. Roston's office for elevated blood pressure (Tr. at 317, 323). It was 142/96. Medication was prescribed.

On April 23, 2004, plaintiff was seen in Dr. Roston's office; his blood pressure was 166/90 (Tr. at 317, 323).

On July 12, 2004, plaintiff was seen in Dr. Roston's office; his blood pressure was 170/96 (Tr. at 317, 323). He also reported chronic low back pain and said he had been taking Flexeril, a muscle relaxer.

On September 22, 2004, plaintiff was seen at Skaggs Regional Medical Center complaining of back pain (Tr. at 301-304). "According to his wife he has been staggering and falling at times." Plaintiff also reported chronic neck pain but on this date it was his back that was hurting. His blood pressure was 145/95. "The patient has history of hypertension, chronic back and neck pain syndrome. Apparently has not worked in a year. Has had in the past at least 2 severe motor vehicle accidents. He states that more than 10 years ago he had neck and back fractures and subsequent to that had fracture of his left femur requiring a rod." Plaintiff was taking Skelaxin (muscle relaxer), Naproxen (non-steroidal anti-inflammatory), and Lortrel (for hypertension). Louis E. Mire, M.D., observed a "heavy odor of alcohol on his breath with slurred speech. . . . [D]oes not appear to have any neck pain. . . . Has subjective back pain. . . . Due to his history of falling, staggering, etc. he had some lab work done for

17

evaluation. CBC [complete blood count] and basic metabolic panel were normal. Blood alcohol level was quite elevated to 0.260 [0.08 is legal intoxication]. Urine drug screen was negative. Lumbar spine and pelvis x-rays were negative" although disc space narrowing at L5-S1 was seen. Plaintiff was "cautioned about drinking alcohol. He states he 'always drinks a lot of alcohol that goes along with his profession as a construction worker.' Although, as indicated above, the patient has apparently not worked in a year." Plaintiff was assessed with back pain and alcohol intoxication. He was given a Toradol shot [non-steroidal anti-inflammatory] and also will be given a prescription for Darvocet N [narcotic] for pain."

More than two years later, on January 26, 2007, plaintiff was seen in Dr. Roston's office (Tr. at 317, 323). His exam was normal, blood pressure was 166/96.

A year later, on February 22, 2008, an Outreach Brief Patient Health Questionnaire was completed by an outreach worker (Tr. at 254-255). This appears to have been done in Montana. According to the form, plaintiff reported that he had not felt down, depressed or hopeless. He had not had bad feelings about himself. He had not had trouble concentrating on things. He had not had thoughts of self harm. He had occasionally had little interest or pleasure in doing things; he had occasionally had problems either moving or speaking too slowly or being fidgety. He had nearly every day had problems with sleep, feeling tired or having little energy, and having appetite disturbance. Plaintiff had not had any problems with anxiety in the past four weeks. When asked how difficult these problems had made it for him to do his work, take care of things at home or get along with other people, plaintiff chose, "somewhat difficult." Plaintiff was asked if he had ever felt he ought to cut down on his drinking, if people had annoyed him by criticizing his drinking, if he had ever felt bad or guilty about his drinking and if he had ever had a drink first thing in the morning -- he answered "no" to all of those.

18

On February 26, 2008, plaintiff was seen at the Montana Migrant Council, Inc., by a nurse for "baseline assessment of extensive medical history and current illness" (Tr. at 246-248, 250). He said he was new to the area and complained of sinus infection symptoms. He reported a history of joint pain, a "cervical fracture", surgery on his hip, a rod in his femur, and constant neck pain. He reported currently smoking a pack of cigarettes day and had for 25 years. He chewed tobacco and continued to use alcohol daily. "ETOH abuse many years now". His blood pressure was 160/100. She observed that plaintiff walks with a limp. She described him as pleasant and noted that he appeared discouraged and wanted help regaining his health. Plaintiff was referred to Dr. McIntyre for a complete work-up; however, his mental status was noted to be normal.

On February 28, 2008, the nurse spoke with plaintiff's wife about making an appointment with Dr. McIntyre that day (Tr. at 246). Mrs. Brumfield said she would try to contact plaintiff to see if he could make the appointment. Plaintiff was unable to get off work, so the appointment was set for March 4.

On March 4, 2008, plaintiff had lab work done which showed elevated triglycerides and elevated liver enzymes (both SGOT and SGPT) (Tr. at 246).

On March 14, 2008, plaintiff had an EKG (Tr. at 246).

On April 10, 2008, plaintiff was notified of the need to get a cervical spine x-ray (Tr. at 244).

On April 18, 2008, plaintiff was prescribed Fluoxetine (generic Prozac, an anti-depressant) (Tr. at 244). "After consult today she affirms that Kelly[3] does not see ETOH as a problem and is related to pain. She would prefer behavioral therapy but agreed that this was

_____

[3]According to plaintiff's application for benefits, he went by his middle name of Kelly.

19

not affordable for Kelly. Agreed that Kelly was intoxicated at exam today. Patient did state he would like to quit smoking. Will enroll in [illegible]."

On April 24, 2008, plaintiff's records at the Montana Migrant Council indicate that his March 14 record mistakenly listed a positive PPD (test for tuberculosis) (Tr. at 243). "It was NOT for a positive PPD as the report per Dr. Randolph."

On April 29, 2008, plaintiff's records showed that he needed to have a PPD test as his x-ray demonstrated prior granulomatous exposure (Tr. at 243).

On May 2, 2008, plaintiff called the office at the Montana Migrant Council stating that he ran out his blood pressure medication (Tr. at 242). The doctor's office mailed him some medication.

On May 19, 2008, plaintiff's wife called the office at the Montana Migrant Council stating that plaintiff had run out of his Prozac (Tr. at 242). Mrs. Brumfield was told that plaintiff needed to come in for a follow-up appointment.

On June 4, 2008, plaintiff's records show that his cervical spine films were received with the following impression: "severe neural foraminal narrowing of C3-4, C4-5, and C6-7 on the right and C3-4 on the left" (Tr. at 241-242).

On June 26, 2008, plaintiff canceled an appointment with MMC Behavioral Health (Tr. at 251-253). "This was to be his initial one but patient stated that something came up. I took the opportunity to introduce myself and initiated a limited session over the phone [illegible]. Patient states that he would make appointment for next month." The counselor asked plaintiff how often during the last two weeks had he experienced certain problems. His responses were as follows:

a. Little interest or pleasure in doing things - has not experienced at all

b. Feeling down, depressed or hopeless - has not experienced at all

20

c.      Trouble falling or staying asleep, or sleeping too much - has experienced nearly every day

d.      Feeling tired or having little energy - has experienced more than half the days

e.      Poor appetite or overeating - has not experience at all

f.      Feeling bad about yourself, or that you are a failure, or have let yourself or your family down - has not experience at all

g.      Trouble concentrating on things, such as reading the newspaper or watching television - has not experienced at all

h.      Moving or speaking so slowly that other people could have noticed, or the opposite - being so fidgety or restless that you have been moving around a lot more than usual - has not experienced at all

i.      Thoughts that you would be better off dead, or of hurting yourself in some way - has not experienced at all

He was asked if, in the past four weeks, he had had an anxiety attack, suddenly felt fear or panic -- he said, "no."

He was asked, of the positive answers above (i.e., his difficulty sleeping and feeling tired and having little energy, as everything else was answered negatively), "how difficult have these problems made it for you to do your work, take care of things at home, or get along with other people?"  Plaintiff responded, "Not difficult at all" (Tr. at 252).

Plaintiff was asked the following questions, to which he answered "no" --

1.      Have you ever felt you ought to cut down on your drinking/drug use?

2.      Have people annoyed you by criticizing your drinking/drug use?

3.      Have you ever felt bad or guilty about your drinking/drug use?

21

4.     Have you ever had a drink/used drugs first thing in the morning to steady your nerves or get rid of a hangover (eye-opener)?  There are no further records from MMC Behavioral Health.

On June 27, 2008, plaintiff cancelled his appointment at the Montana Migrant Council doctor's office, but his wife called and said he was out of his Prozac (Tr. at 241).  A prescription was called into the pharmacy with the direction that there would be no refills until plaintiff was seen by the doctor.

On July 7, 2008, plaintiff again canceled his appointment at the doctor (Tr. at 241).  He claimed he could only come in on Friday afternoons.

On July 16, 2008, someone from the Montana Migrant Council doctor's office spoke to plaintiff's wife who said that plaintiff canceled his appointment because he had an accident (Tr. at 241).

On September 18, 2008 (plaintiff's alleged onset date), he was seen at Skaggs Regional Medical Center in Branson, Missouri, after having fallen ten feet off a ladder (Tr. at 291-300). Plaintiff drove himself to the hospital.  He landed on his feet and then rolled, he felt a pop in his neck, and he was ambulatory after the fall.  He complained of pain on weight-bearing.  He had no depression or any other complaints.  Plaintiff was smoking less than one pack of cigarettes a day and reported drinking beer daily.  Plaintiff had tenderness, muscle spasm, and reduced range of motion in his neck and back.  He had moderate tenderness in both feet.  X-rays and EKG showed no acute findings.  Plaintiff had degenerative joint disease in his neck and back.  MRI showed "stable ligamentous injury and muscle edema, no nerve impingement or chord compression.  Some old osteophytes and narrowing of the neural foramina at several levels."  CT scan of his spine showed "evidence of severe osteoarthritis on the cervical spine." X-rays of his lumbar spine showed no acute abnormality but severe degenerative disc space

disease at L5-S1. X-rays of both feet were normal. His thoracic spine was normal. His condition was described as "good and stable," he was assessed with tobacco abuse and fall from ladder, and he was discharged with Lortab (narcotic), no refills; Flexeril (muscle relaxer), no refills; and Prednisone (steroid), no refills.

On November 19, 2008, plaintiff contacted the Montana Migrant Council and said he had moved to Missouri -- he requested that his medications be mailed to him at his new residence (Tr. at 249). Plaintiff was told he would need to find a provider in Missouri to obtain his medication. All of plaintiff's assessment forms, progress notes, lab reports and x-rays were mailed to plaintiff on November 21, 2008, since he did not yet have a provider.

On December 8, 2008, plaintiff was seen in Dr. Roston's office (Tr. at 317, 323). His blood pressure was 160 over an illegible number. His medications were listed, he had a normal physical exam including range of motion.

On January 5, 2009, plaintiff went to Skaggs Regional Medical Center due to high blood pressure (Tr. at 288-289). Alcohol abuse was listed as a modifying factor. He had just started a new prescription that day. Plaintiff was "only slightly anxious." Plaintiff indicated he had had similar symptoms "many times previously" and had not been seen or assessed recently. He had no back pain, no headaches, no difficulty sleeping, no weakness. He reported a past history of hypertension and alcoholism. "Heavy alcohol use. . . . Patient is a longstanding alcoholic." He was on no medications. He was a smoker. His physical and mental exams were normal. He was assessed with "uncontrolled hypertension, probable alcohol withdrawal (mild)." Plaintiff was given prescriptions for hypertension and he was prescribed Librium for anxiety with no refill.

About six months later, on June 30, 2009, plaintiff was seen in Dr. Roston's office (Tr. at 322). His medications were listed. The next treatment record is dated December 20, 2010

23

-- a year and a half later. All records during that 18-month time period were in connection with his applications for government benefits, not for treatment of his impairments.

On May 4, 2010, Kenneth Burstin, Ph.D., completed a Psychiatric Review Technique finding that plaintiff's mental impairment (anxiety-related disorder) is not severe (Tr. at 329- His disorder was noted to be Anxiety NOS.[4] He found that plaintiff had no difficulties in restriction of activities of daily living; no difficulties in maintaining social functioning; no difficulties in concentration, persistence or pace; and no episodes of decompensation. In support of his findings, Dr. Burstin wrote:

> Claimant is a 47-year-old male alleging 'hip, back, hands, neck, knees, legs, vision, hearing, arthritis, stomach ulcer, high blood pressure, right foot, carpel tunnel, attention deficit disorder, depression, anxiety.' . . .

> Montana Migrant Council, 2/2008; claimant completed the PHQ-Brief and reported problems with sleeping, feeling tired or having little energy, and changes in appetite nearly every day, and that he lacked interest in doing things for several days. He marked "not at all" when asked if he had been feeling down, depressed or hopeless, and when asked about thoughts of harming himself or having trouble with concentration. He also marked that he had not been having anxiety attacks. Claimant also denied having a problem with his drinking on this questionnaire; however, he reported on 2/26/08 that he used to abuse ETOH, but was down to just several beers per day. 6/2008; claimant's answers to these same questions had improved, with claimant only having complaints of having trouble with his sleep and feeling tired. It is reported that claimant was on Prozac.

> Skaggs Community Health Center, 2008: claimant was seen for back pain and 2009 for uncontrolled hypertension, and no mental allegations were made at either time.

> Dr. Roston's notes in 6/09 appeared to diagnosed anxiety, but otherwise, there was no evidence regarding signs, symptoms, or capacities.

> ADL/Allegations - Claimant reported having difficulties with memory, completing tasks, concentration, understanding, and following instructions. Claimant stated he has

---

[4]An abbreviation for the medical term "not otherwise specified," NOS is used as a broad-based diagnostic category, for instance "depression NOS." The choice of the NOS diagnosis means that the diagnosing doctor believes that the patient's problems fall into a particular family of disorders (e.g., depressive disorders, anxiety disorders, etc.) but that there is not enough information at the time of diagnosis to better specify the type of disorder.

24

difficulty reading and writing and it is noted that a friend assisted him in writing out his forms. Claimant did however maintain employment as a construction labor[er] for over a year and as a carpenter in previous years making SGA [substantial gainful activity earnings]. Claimant reported he does have friends he socialized with, goes shopping with and fishing with. Claimant stated he doesn't like to go into public and that he has anxiety and panic attacks when stressed. He stated he does not need reminders to do things and that he just forgets sometimes. He said he receives encouragement from his friends.

At the time of application, claimant did not report being on any psychiatric medications. Claimant has not sought or received any mental health services, nor is there MER [medical records] supporting counseling/therapy or psychiatric hospitalizations. Claimant's allegations of limitations are found to be partially credible, to the extend that MDI [medically-determinable impairment] has been established. However, MER does not support claimant's allegations of a severe disabling mental illness. Claimant's impairment is therefore concluded to be non-severe.

On September 3, 2010, plaintiff was evaluated by John Kreymer, Psy.D. as part of the

Taney County Office of Family Services/Family Support in connection with an application for

benefits (Tr. at 380-382). Dr. Kreymer utilized a clinical interview, mental status

examination, review of available records (although none were medical records), behavioral

observations, and brief history. Because Dr. Kreymer's opinion is an issue in this appeal, I have

highlighted in red every instance where Dr. Kreymer's record is based on what plaintiff

reported during the evaluation:

> He reported that he had been living in Montana and worked there as a migrant farm worker. He recently returned to Missouri after separating from his wife. He is reporting multiple physical and mental health related concerns. He states he cannot get medications or medical care at this time due to finances. He stated that he was getting his medications for free while living in Montana. He reported that he has filed for disability.

> He complained of anxiety and depression. He did bring some records with him to the appointment, these were hand written records and not from a physician or hospital.[5] These hand-written notes detailed his complaints of sharp and shooting pain along with aspects of crying, feelings of hopelessness, and "jittery" mood. He reported his pain level as eight out of ten and he stated that "it never gets better." He went on to

---

[5]This is curious since all of plaintiff's medical records, lab reports, and x-rays from the Montana Migrant Council were mailed to plaintiff on November 21, 2008.

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 25 of 52

detail in his written comments pain issues with neck, back, shoulder, and leg focus. He also had complaints of sleep, numbness in his hands, and various aspects of panic and depressed feelings. He went on to complain [of] high blood pressure, blackouts, and chest pain. In general, he was very somatic,[6] and he tried to emphasize his complaints were written down rather than report them verbally.

He reports that he "despises" most women. He stated that he has had multiple relationships with women that have pretty much have ended up badly. He notes that he has been married four times.[7] At this time he is separated from his fourth wife. He reports that he can no longer do simple things for himself. He has been unable to care for himself and he was dependent upon his wife for many of his issues, per his report . . . .

After detailing all of these issues Mr. Brumfield reported, "I'm fed up. I just want to kill something, and I'm tired of being like this." He was very angry and frustrated with his situation, but he said he was not actually homicidal. He presents with decreased coping ability and stress tolerance. When asked how he copes with his difficulties, he stated he tends to isolate. He presents with very limited insight and he is very somatic. He reports difficulties with bad dreams, nightmares, and relives experiences related to the 1996 car accident. He believes he had PTSD [post traumatic stress disorder].

At present he is not working. He is living with his mother. He was married (and remains married) to his fourth wife for seven years, but they are separated and he is now in Missouri. He has two children from his first wife. His work history is noted as a migrant farm worker. He had worked on potato farms and horse ranches in Montana. He also did some carpentry work. . . .

He has never had psychological treatment. He has a past history with alcohol dependence and some drug usage. In spite of alcohol dependence he states he still drinks beer at times. He denies using hard liquor. He stated that several years ago he use [sic] to use methamphetamine and marijuana but has not used in 18 years. In 1989 his father died and he "... went off the deep end." He self indulged in alcohol at the time.

At present he does not have a driver's license. He notes that his license was revoked in Montana due to issues over a DWI, property offenses, and over $1,700 in unpaid fines. He does not have access to reliable transportation. Stressors include marital separation, lack of employment, no permanent residence, lack of stable income, and he states that

_____

[6]Pertaining to the body as opposed to the mind.

[7]In his application for disability benefits, plaintiff reported that he married Michelle Brownfield in 2001 and that he was previously married to Angela Wyman (whether there is a relation between her and the nurse practitioner who has treated plaintiff is unknown) in January 1997 and the marriage ended with the death of plaintiff's wife in February 1997 (Tr. at 145-146). He did not report any other marriages, and he did not report any divorces at all.

26

he only has some clothes with him from moving here. He says he has a few friends to whom he could turn to [sic] if needed. He indicated having been suicidal in the past but never acted upon his ideation.

Mr. Brumfield did report that he would like to repay money that he owes people but he is unsure how he would pay it back. He said he would like to earn money; he said he might be able to sit on a mower and mow grass, but he said he could not push a mower. He said he cannot do weed eating or any other type of lifting, bending, or twisting or physical labor. He says he has trouble doing the dishes at home. He reports a goal is to feel better and went on to say that he would like to "have my own house, get my license back" and he is also trying to obtain disability benefits.

Mental Status Examination:

    Appearance/Dress: Mr. Brumfield was alert and oriented in all spheres. He was in casual dress. Appearance was fair. Eye contact was direct. Behavior was appropriate. Hygiene was good. Overall appearance and engagement were reserved.

    Speech/Language: Expressive and receptive language abilities were intact. Speech was coherent and goal directed. . . . He had no unusual verbalizations. He was able to understand questions and simple tasks presented to him. No aphasia[8] or anomia[9] was noted.

    Socialization: Mr. Brumfield reports he isolates from most people. This is his primary means of coping with his difficulties. He is currently separated from his fourth wife. He is living with his mother and he has no other real social contacts, but he said he thought there were a few people he can turn to if he ever needs help with anything. He is reporting having few resources. He is not working and has no money, although his mother is providing resources for him at present. He appeared to relate well on a one to one basis. He could communicate well. He said he has been reluctant to address psychological issues, but it was noted that he needed to make changes and do thing differently; his isolation strategy has not been effective and he recognized that outcome.

    Mood/Affect/Sleep/Appetite: Mr. Brumfield describes himself as angry, resentful, and anxious. His mood was blunted with flat affect. He said he avoids people most of the time. He reports decreased sleep. He reports fair

---

    [8]Aphasia is a disorder caused by damage to the parts of the brain that control language. It can make it hard for the patient to read, write, and say what he means to say. It is most common in adults who have had a stroke. Brain tumors, infections, injuries, and dementia can also cause it.

    [9]A problem with word finding; impaired recall of words with no impairment of comprehension or the capacity to repeat the words.

appetite.  He reports experiencing bad dreams and nightmares from his 1996 motor vehicle accident.  He believes he has PTSD.  He did not endorse "flashbacks" or particular aspects of hyperarousal or startle responses.  He does report issues with rumination.

* * * * *

Memory/Attention/Concentration:  Mr. Brumfield reports that [he] has difficulties with memory and concentration.  He described himself as "scatterbrained."  He stated that he has a racing mind and cannot stay focused.  Clinical observations noted that long term memory for recall of personal information was intact.  Short term testing noted good immediate recall and fair recall after a five minute delay. . . .  [S]hort term memory is considered fair in overall scope.  He was asked to do spelling tasks but he stated that he could not do them in his head and then asked for a pencil (as this is a mental task no pencil is provided).  He still never completed the tasks.  He was able to comply with simple repetition tasks.  He could repeat verbal and written statements with no difficulty.  He had difficulties with serial calculation tasks.  He stated he could not do the tasks even if he could count on his fingers, which he started to do but then quit thus never completing the task. Visual naming skills were intact for recognition and function.  All in all basic cognitive and executive skills appear to be intact but use seems to be inconsistent and may vary with motivation and effort.

Thought/Perceptual Process:  There were no signs of an active psychotic process.  He denied experiencing current hallucinations and/or delusions.  Presently, speech is clear, and there was no evidence of neologisms,[10] odd speech, tangentiality,[11] or looseness in association.[12]

Abstraction:  Mr. Brumfield was asked to explain the meaning of various proverbs and abstract statements.  He reported, "Don't have a clue, doesn't make sense to me," to every proverb asked of him.  He comes across as extremely concrete in thinking.  Tasks and information should probably be presented to him in concrete terms thus minimizing complexity and ambiguity.  This may help to ensure task understanding and task compliance.

---

[10]The invention of new words regarded as a symptom of certain psychotic disorders, such as schizophrenia.

[11]A pattern of speech characterized by oblique, digressive, or irrelevant replies to questions; the responses never approach the point of the questions.

[12]A disturbance of thinking in which the association of ideas and thought patterns becomes so vague, fragmented, diffuse, and unfocused as to lack any logical sequences or relationship to any preceding concepts or themes.  It is a symptom of schizophrenia.

28

Intellectual Functioning:  Intelligence is estimated to be in the low average to average range.  Formal intellectual assessment could be helpful in looking at areas of strengths and weaknesses.

Persistence:  Persistence to tasks was somewhat limited.  He seemed to be easy to engage but appeared to give somewhat marginal effort to tasks presented.

Comprehension:  Comprehension abilities appeared to be grossly intact.

Insight/Judgment:  Estimated to be marginal.

Prognosis:  Estimated to fall between guarded to possibly marginal; note the tendency to isolate and note the somatic focus.

Diagnostic Impressions:

|         |                                                                                       |
|---------|---------------------------------------------------------------------------------------|
| Axis I: | Dysthymia[13]                                                                          |
|         | Undifferentiated Somatoform Disorder[14]                                               |
|         | Rule Out Posttraumatic Stress Disorder                                                 |
|         | Alcohol Abuse                                                                          |
|         | Sustained Remission from marijuana and Methamphetamine (**by personal report**)        |
|         |                                                                                       |
| Axis II:| Mixed Personality Features                                                             |
|         | R/O [rule out] Personality Disorder NOS [not otherwise specified][15]                  |

---

[13]Dysthymia is a mild but long-term (chronic) form of depression.  Symptoms usually last for at least two years, and often for much longer than that.  Dysthymia interferes with the ability to function and enjoy life.  With dysthymia, one may lose interest in normal daily activities, feel hopeless, lack productivity, and have low self-esteem and an overall feeling of inadequacy. People with dysthymia are often thought of as being overly critical, constantly complaining and incapable of having fun.

[14]Undifferentiated somatoform disorder consists of one or more persistent physical complaints, not intentionally produced or feigned, that cannot be fully explained by a general medical condition or the direct effects of a substance; this category is the group of persisting disorders that do not completely satisfy the criteria for other somatoform disorders.

[15]Although not part of the formal DSM-IV convention, many clinicians use the term "Rule Out" just prior to a diagnosis to indicate that not enough information exists to make the diagnosis, but it must be considered as an alternative.  An abbreviation for the medical term "not otherwise specified," NOS is used as a broad-based diagnostic category, for instance "depression NOS."  The choice of the NOS diagnosis means that the diagnosing doctor believes that the patient's problems fall into a particular family of disorders (e.g., depressive disorders, anxiety disorders, etc.) but that there is not enough information at the time of diagnosis to

|          |                                                          |
|----------|----------------------------------------------------------|
| Axis III: | **Patient report** of somatic concerns |
| Axis IV: | Problems with primary and social supports; occupational, financial and healthcare concerns, marital and housing concerns |
| Axis V: | Current GAF = 55 to 60[16] |

Summary and Recommendations:

Results of this evaluation note the presence of dysthymia and significant somatic concerns. There may be the presence of PTSD but more assessment is recommended. More psychological testing could be of benefit here to better assist in making a more definitive diagnostic clarification.

Mr. Brumfield has multiple somatic complaints. **He presents himself** as very psychologically and physically deficient at this time. He was working in Montana but **now states** he cannot work. It is recommended that appropriate medical assessment(s) and functional capacity assessments be investigated and utilized as appropriate. Vocational rehabilitation should be involved as deemed appropriate. **He did personally say** he might be able to do mowing with a riding mower, so he may have some work skills. He has worked before in carpentry, farming, and ranching.

**He is reporting** depression and there could be of [sic] benefit in reviewing his antidepressant and switching to something with more of an anti-obsessional impact along with calming potential. He should be referred for psychotherapy and pain treatment. Pain treatment should have a behavioral medicine focus as a primary part of the treatment process.

It is unlikely he will make much progress until he starts to address how he thinks and makes choices. He needs to do more than isolate and hide from his issues. So far, that has been his coping strategy and it has not been effective. He recognized that and even verbalized that result, but **he said** he does not like to talk about his problems and has not done so thus far. So, it is recommended that he examine what he wants to change and how he might go about effecting that change and then look for someone (a professional) that he can build trust in to address those issues with and learn new coping skills and improve his functioning over time.

---

better specify the type of disorder.

[16]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Dr. Kreymer then completed a Medical Source Statement - Mental finding that plaintiff has slight limitation in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to make simple work-related decisions

- The ability to be aware of normal hazards and take appropriate precautions

He found that plaintiff has moderate limitation in the following:

- The ability to understand and remember detailed instructions

- The ability to set realistic goals or make plans independently of others

He found that plaintiff has marked limitation in the following:

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

The abilities highlighted in blue were found by Dr. Kreymer to be both markedly limited and extremely markedly limited. He did not explain why these abilities were rated in two separate categories (Tr. at 384, 388).

On December 20, 2010, plaintiff saw Nurse Wyman for a follow up[17] (Tr. at 345, 373). Plaintiff's blood pressure was 208/104. "Here for follow-up. He looks much better. Not as depressed, he is sleeping better. He has applied for Medicaid. He is still requesting pain meds. I told him to take 2 Lisinopril [treats hypertension] and if that didn't lower his blood pressure we would change his meds." His physical exam was normal. Nurse Wyman assessed unspecified backache, unspecified anxiety, and unspecified episodic mood disorder. She gave him samples of Zyprexa (treats schizophrenia and bipolar disorder), and Pristiq (treats depression), and prescribed Advair (treats asthma), Lisinopril (treats hypertension), Pristiq (treats depression), and Toradol (non-steroidal anti-inflammatory).

---

[17]One record of Sheila Wyman, a nurse practitioner, is undated (Tr. at 344). It indicates that plaintiff's chief complaint is "getting established" therefore I assume this visit was before the December 20, 2010, follow up with Ms. Wyman. During plaintiff's first visit with Nurse Wyman, he requested refills of Xanax (treats anxiety) and Hydrocodone (narcotic). "He says Dr. Roston refused to fill these before. I told him Dr. Roston was my collaborating physician and these could not be refilled. He has chronic back pain, mood swings, anxiety and depression. He has run out of his B/P [blood pressure] meds. . . . He is applying for disability." He was assessed with unspecified backache, unspecified anxiety, and unspecified episodic mood disorder. The brief physical exam that was performed was normal. He was given samples of Pristiq (treats depression) and Zyprexa (treats schizophrenia and bipolar disorder) and along with prescriptions for those medications and Soma (muscle relaxer), Buspar (treats anxiety), and Lisinopril (treats hypertension).

32

On February 8, 2011, plaintiff saw Nurse Sheila Wyman (Tr. at 405). The chief complaint was "down in his back." His blood pressure was 180/98. "Here for continuing pain in neck and back. He recently found out that he has medicaid. He needs refills." Plaintiff's neck and back were tender to palpation. She assessed unspecified backache, benign essential hypertension, anxiety disorder in conditions classified elsewhere, and extrinsic asthma unspecified. She recommended he be seen at Branson Neurology.

On February 15, 2011, plaintiff saw Nurse Sheila Wyman (Tr. at 406). The chief complaint was "disab[ility] paperwork". His blood pressure was 128/80. "Here for disability paperwork and possible med changes." Plaintiff complained of continued back pain and said he was waiting on a referral to Branson Neurology, although it is not clear from whom the referral was to come. "*Disability form filled out based on patient's perception of abilities*." (emphasis added).

The Medical Source Statement - Physical completed by Nurse Sheila Wyman which bears a signature purporting to be that of Dr. Roston along with Nurse Wyman was dated March 3, 2011 (Tr. at 376-377). The form indicates that plaintiff can lift and carry up to ten pounds, stand and walk continuously for 30 minutes, stand and walk for 3 hours per day, sit continuously for two hours, sit for a total of six hours per day, and was limited in his ability to use foot controls. Next to the finding that plaintiff can sit for six hours per day was written the following: "4 hrs competitive, 2 hrs noncompetitive, this is on a good day. Some days are worse." The form indicates that plaintiff can never kneel, crouch, or crawl; can occasionally climb, balance, or stoop; and can frequently reach, handle, finger, feel, see, speak and hear. Plaintiff should avoid moderate exposure to extreme cold or heat, weather, wetness, humidity, dust, fumes, vibration, hazards, and heights. He needs to lie down every four hours for an hour at a time due to pain. He has no known side effects from medication.

33

On March 18, 2011, plaintiff had a second psychological evaluation performed by Dr.

Kreymer at the request of his disability attorney (Tr. at 392-396).

Mr. Clifton Brumfield was seen for psychological review as per a referral/ request from Mr. J. T. Magness, Attorney at Law. Mr. Brumfield was previously seen by the psychologist (September 3, 2010), and that report was reviewed in preparation for this re-review of Mr. Brumfield's current psychological status. Mr Brumfield is current[ly] seeking disability benefits. He previously was seeking medical assistance benefits and reportedly did qualify for Missouri HealthNet in October or November 2010 per client report. This current evaluation was conducted in order to assist with a review of general psychological functioning and to compare functioning over the last (approximate) six months (time between evaluations).

Dr. Kreymer performed a clinical interview, mental status examination, behavioral

observations, brief history, and he reviewed his report of September 3, 2010.

He essentially reported very little change in his situation from September 2010. He did say that he was now (as of March 18, 2011) living in his mother's house but he preferred to live "in the woods." He said he did not like "coming to Springfield" as he described it as "the big city" and he said often how he does not like going anywhere where lots of people are. He said he wants to be alone and prefers to be alone as much as possible. As he is living at his mother's house, he said he was only there because the place he has "in the woods" did not have heat; he said he would probably be going back to the woods as soon as the weather was stable and temperature allowed. He said his nephew was living in his mother's house now as well, and he described the situation as quite difficult (said he often was angry with the nephew and has had to "bite my tongue.").

Mr. Brumfield, as of this current evaluation, noted issues with anxiety, depression, and tight muscles in addition to anger. He said he feels "pressure closing in on me." Yet, he has not sought out ways to change his responses or situation (other than going into the woods). He complained of poor sleep but denied having any bad dreams/nightmares. He said he gets about four hours of sleep at the present time/each night, often wakes up hurting, and then gets mad because he hurts and does not feel rested. He said that "...everything turns back to anger."

In September 2010, Mr. Brumfield had reported the following: "I'm fed up. I just want to kill something, and I'm tired of being like this." As of March 2011, he continued to report issues with anger and depression, however his primary coping mechanism still appeared to be isolation to the woods. He said that he does not get angry if he is not around people. However, it is probably quite unrealistic to expect that he can live totally alone and avoid people for the remainder of his life.

. . . As of his time in Missouri he has not been employed. He remains unemployed as of this time of evaluation. He said he has not had psychological

34

treatment (past or present), and when this subject was broached (particularly as it related to depression and anger) Mr. Brumfield said he did not need anything as long as he could go to the woods. He continues to deny any substances difficulties, although he has acknowledged still drinking beer at times. He said he is still clean from methamphetamine and marijuana (no use of either for over 18 years); he said he intends to stay clean.

In terms of stressors, he still reports having no driver's license and still has the aforementioned legal issue in Montana (outstanding fines). He reports physical/mental health concerns, finances, and living situation as stressful. He said that he finds himself having trouble trying to stay organized, and he said that he has no interest in forming relationships with people at this time. He said he continues to dwell on his problems, but again he doesn't seem to be making any real changes towards doing anything about it other than to isolate himself.

Mental Status Examination:

Appearance/Dress: Mr. Brumfield was alert and oriented times three. He was in casual dress. . . . He was clean with appropriate appearance otherwise. Behavior was appropriate. Hygiene was good. Overall appearance and engagement were more engaging tha[n] his previous evaluation behavior in September 2010.

Speech/Language: Expressive and receptive language abilities were intact . . . . Speech was coherent and goal directed. . . . He was able to understand questions and simple tasks presented to him. No aphasia or anomia was noted. He was able to communicate well and he seemed more open and agreeable today, more so than in September 2010.

Socialization: Mr. Brumfield continues to report how he isolates from people, and he said he does not like to go to "the big city." He said he prefers the woods and prefers animals to people. He said he has no interest in any relationships (to include dating/intimate relations at this time). He wants to return to the woods to be alone, although right now he continues to live at his mother's house as she has had heat/utilities and his place in the woods did not have heat. He acknowledges anger towards people and a great deal of impatience. He remains separated from his fourth wife, and he has had no contact with her for some time by report. He remains unemployed. . . . He does continue to have social abilities that suggest he can relate on a one-to-one basis (at least with this examiner), however social abilities with more people/larger social settings will likely see less agreeableness and decreased stress tolerance.

Mood/Affect/Sleep/Appetite: Mr. Brumfield continues to acknowledge anger and has reported issues with anxiety and depression as noted before. His affect during the current evaluation was more full range, whereas before he seemed to be blunted. He was more cooperative at this time, whereas before he seemed to be more defensive and distant. He continues to report decreased sleep

35

consistent with his previous report.  **He had reported** bad dreams before, however **he stated** that the bad dreams have abated . . . .  **[H]e does not endorse** flashbacks, distress, bad dreams, or hyper-arousal at this time.  He still does appear to ruminate over his life history and issues of having been slighted by others, however, thus likely promoting more anger.

* * * * *

<u>Memory/Attention/Concentration</u>:  . . .  As far as the current evaluation progressed, long term and short term memory both present as consistent with the September 2010 results.  Mr. Brumfield continues to demonstrate ability to follow directions.  He still asks for paper to complete simple spelling and math tasks.  He was reluctant to attempt mental concentration tasks.  All in all basic cognitive and executive skills appear to be intact, but use seems to be inconsistent and may vary with motivation and effort and this remains consistent with results to the previous evaluation.

* * * * *

<u>Intellectual Functioning</u>:  Intelligence is estimated to be in the average range. The previous evaluation noted that he may have been low average to average; it is possible that rat[ing] may have been stemmed out of his resistant presentation. He was more open and engaging today and demonstrated more open/developed language today thus suggested average intellectual abilities.

<u>Persistence</u>:  He was more engaging and seemed to be more open to the evaluation than previous/September 2010.

<u>Comprehension</u>:  Comprehension abilities appeared to be grossly intact.

<u>Insight/Judgment</u>:  Estimated to be marginal given **preference to isolate** and continued issues with anger, depression, and anxiety.  **He complains** of pain and physical problems, but he will have to associate with people in order to make changes in those areas in addition to depression, anxiety, and anger as **he had noted**.

<u>Prognosis</u>:  Estimated to fall between guarded to possibly marginal; note the tendency to isolate and avoid people.  **He has indicated** that he does not have difficulties as long as he avoids people, however this is not likely to be a workable life-long solution.

Diagnostic Impressions:

Axis I:  Dysthymia
Rule Out Undifferentiated Somatoform Disorder
Alcohol Abuse **by History** (In Sustained Remission)
Polysubstance Dependence (In Sustained Remission; history of

36

marijuana and methamphetamine with no use in 18 years)

| | |
|---|---|
| Axis II: | Mixed personality features |
| Axis III: | **Patient's report** of pain/physical issues as previously indicated |
| Axis IV: | Problems with primary and social supports; occupational, financial and healthcare concerns, marital separation/isolation, housing concerns |
| Axis V: | Current GAF = 50 - 55[18] |

Summary and Recommendations:

Results of this re-evaluation remain generally consistent with the findings of the September 2010 evaluation. **Mr. Brumfield still has physical health/pain complaints** in addition to depression/anxiety concerns and anger issues. However, his major coping mechanism is isolation from people in general and this continues to be intensifying in scope/practice. He seems to be resistant to the idea of any formal attempts to use mental health interventions to help improve his situation. Insight presents as marginal, but his situation might be improved if he were to engage in stress and anger related treatment and work through resistance.

. . . He might still benefit from Vocational Rehabilitation assessment, however he still **seems to prefer** to retreat to the woods and live on his own, and **he has expressed** no specific interest in employment at this time; social skills may impact his ability to work and relate to people in a negative manner. . . .

His ability to relate to anyone (other than his mother or a close cadre of trusted figures) is likely to be superficial due to impatience and temper difficulties. The antidepressant may help with mood/anxiety and temper to some degree, but psychotherapy should still be considered to help with coping and mediate situational and interpersonal factors that medication cannot address. . . .

On March 21, 2011, plaintiff saw Nurse Sheila Wyman complaining of neck and back pain (Tr. at 407). "Here requesting an injection of Toradol for chronic neck and back pain." Plaintiff complained of pain in his hands and knees. His physical exam was normal except his

---

[18]I note that despite the repeated notations in this report that plaintiff's symptoms had improved in one form or another, his current GAF is lower at this examination than it was during the previous examination.

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 37 of 52

lower back was tender to palpation. His blood pressure was 132/90. Plaintiff was given an injection of Toradol. He had images of his lower back done which showed mild to moderate degenerative spondylosis of the lumbar spine most severe at the L5-S1 level where diffuse posterior disc osteophyte formation and facet arthropathy was seen causing mild lateral recess stenosis and bilateral neural foraminal narrowing (Tr. at 412-413).

On April 5, 2011, plaintiff saw Nurse Sheila Wyman for lab work (Tr. at 408, 410). His blood pressure was 144/88. Plaintiff complained of sweating and weight gain. "He does drink quite a bit of alcohol." His physical exam was normal, including normal range of motion in his neck. He was assessed with abnormal weight gain, unspecified backache, and chronic depressive personality disorder, although there were no complaints of depressive symptoms and no observations of depressive symptoms. Plaintiff had an MRI of his neck which showed mild degenerative spondylosis at C5-C6 where posterior disc osteophyte formation combined with facet arthropathy causes mild circumferential central thecal sac stenosis.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge William Churchill entered his opinion on June 21, 2011 (Tr. at 10-19). Plaintiff's last insured dated is March 31, 2012 (Tr. at 10, 12).

Step one. Plaintiff has not engaged in substantial gainful activity since his amended alleged onset date, September 18, 2008 (Tr. at 12).

Step two. Plaintiff suffers from the following severe impairments: degenerative disc disease, substance abuse disorder, personality disorder and essential hypertension (Tr. at 12).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 12-13).

Step four. Plaintiff retains the residual functional capacity to perform light work except he can only occasionally bend, balance, kneel, stoop and climb stairs. He cannot climb ladders

38

or ropes.  He cannot work at unprotected heights or around hazardous machinery.  He can frequently perform gross and fine manipulation.  He can concentrate for extended periods of time, respond appropriately to routine changes in a work environment, and perform simple routine work (Tr. at 13).  With this residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 17).

Step five.  Plaintiff can perform the jobs of garment sorter, cashier II, and final inspector, all available in significant numbers (Tr. at 18).  Therefore, plaintiff is not disabled (Tr. at 18).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining

credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant testified that he has not worked since he injured his back when he fell from a ladder while working on September 18, 2008. He stated that when he fell he landed on his feet but, because of the weight of the equipment he was carrying he injured his right foot, neck and back. The claimant indicated that since the accident he has only been treated with non-narcotic pain pills, muscle relaxants and anti-inflammatory medications. He also testified that he continues to experience constant pain in his back and legs. The claimant contents that his legs give out twice a week, and his knees are weak. He denied seeing an orthopedic specialist in more than a year.
>
> * * * * *
>
> Although the evidence of record including the results of diagnostic tests and x-rays establish the presence of the aforementioned "severe" impairments, the evidence fail[s] to support the claimant's allegations that these impairments produce symptoms of the intensity and severity for which the claimant complains. The claimant's professional medical treatment has been conservative in nature consisting primarily of management of prescribed medications and cursory physical examinations. There is no evidence of record that the claimant has required and/or undergone surgical intervention, inpatient hospital care, epidural steroid injections, numerous emergency room visits or any extraordinary measures for treatment of his most recurring complaints of hands, knees, neck and back pain. Additionally, the claimant['s] records show significant gaps

40

in his medical treatment. The claimant admitted that he has never undergone any professional psychiatric medical care. Despite allegations of disability, the claimant reports in the aforementioned "Function Report-Adult" th[at] he remains capable of car[ing] for his personal needs and personal hygiene independently. His hobbies includes [sic] fishing, watching television and caring for his flowers. He prepares his own meals and washes dishes. The claimant also reported that he could pay bills, count change and use a checkbook. Further distracting from the claimant's credibility is that during the psychological evaluation on September 13, 2010, the claimant reported that he had been living in Montana working as a migrant farm worker. Yet in his work history report, he did not list migrant farm worker as one of his past jobs.

(Tr. at 14, 16).

1. *PRIOR WORK RECORD*

Plaintiff's prior work record shows consistently low and sporadic earnings. Even assuming that plaintiff earned income before his 32nd birthday and those records are missing, the 15 years after he began earning income total only $59,146.47 in earned income. This averages out to $3,943 per year, or $75 per week for the entire 15-year earning period. This poor work record suggests that plaintiff's failure to work is not entirely caused by his impairments but by a lifelong lack of motivation to work.

Additionally, plaintiff testified that he rarely if ever received a 40-hour paycheck, but this was because of reasons other than any impairments -- weather, moving from job to job, not having enough orders, etc. And Dr. Kreymer noted that plaintiff had expressed "no interest in employment at this time."

This factor supports the ALJ's credibility determination.

2. *DAILY ACTIVITIES*

Plaintiff reported that he is able to go fishing, he cooks, he does dishes, he visits with friends, he eats with friends at their homes. When asked if he thought he could sit and stand throughout the day, plaintiff testified, "Well, that's what I do." Plaintiff was able to work with

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 41 of 52

migrant farm workers and then in construction during 2008 -- his last year of employment -- and his continued socializing with a few friends supports the ALJ's credibility determination.

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Although plaintiff described his pain as excruciating, the ALJ noted that plaintiff's symptoms have been treated with mild pain medication. He has never needed steroid injections, he has not presented to the emergency room for physical pain (only for uncontrolled blood pressure). He testified that he has always had trouble with his neck and back (since he was 14), yet his employment history consists of physical labor type work. As of April 2011, plaintiff was only taking a "mild non-narcotic pain pill" suggesting that his pain symptoms were not as bad as he alleged in connection with his disability case. Plaintiff testified that he had a cane and a back brace, yet no medical professional ever observed plaintiff using either of those assistive devices.

Plaintiff has never seen a mental health professional and did not even bother to obtain the results of his mental consultative exam. He canceled his initial appointment with a mental health provider in Montana saying something came up, and he never rescheduled. In 2008 his mental status exam was normal and he was noted to be "pleasant." No medical provider ever noted a difficulty getting along with plaintiff and never observed any anger when he was at medical appointments. There is no evidence other than plaintiff's allegations that he is unable to get along with people. In fact, he reported in his Function Report that he has no problems getting along with people, and he reported to the MMC Behavioral Health counselor that he has no difficulty at all (due to mental symptoms) in working or getting along with people.

Plaintiff has not taken medication for any impairment regularly. The record shows numerous instances over the years of plaintiff running out of his medications or simply not

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 42 of 52

taking them for long periods of time between doctor appointments, suggesting that his symptoms, even without medication, were more tolerable than he now alleges.

This factor supports the ALJ's credibility finding.

### 4. *PRECIPITATING AND AGGRAVATING FACTORS*

Although, as the ALJ noted, plaintiff's MRIs and other scans show that there is a medical basis for his back and neck pain, the medical evidence after his September 2008 fall showed chronic conditions, not acute conditions. Therefore, his allegation that his fall "tore up" his lower back is not supported by the records. Additionally, plaintiff's scans showed the same spinal conditions prior to his alleged onset date, and he was able to perform physical labor for some time after those conditions were first discovered.

Plaintiff's failure to take medication regularly as prescribed is a precipitating and aggravating factor for all of his impairments. He continued to smoke despite having uncontrolled hypertension for years. Although he testified that he falls multiple times a week due to his knee problems, there is no evidence in the record to establish a knee impairment, plaintiff never told his doctors that he falls because of his knees, and the only evidence in the record of falling was due to intoxication (plaintiff's blood alcohol content was more than three times the legal limit for intoxication), not due to any physical impairment. Plaintiff continually told medical professionals that he did not see his drinking as a problem, despite showing up for doctor appointments intoxicated several times, drinking on a daily basis even after inpatient treatment, and testifying that he does not drink much now because he can't afford it.

### 5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

The record establishes that plaintiff's mental symptoms improved in Montana after he was prescribed Fluoxetine. His blood pressure was controlled when he took his medication regularly as prescribed. Plaintiff's pain medication was conservative suggesting that his pain

was not at the excruciating level he alleges.  In fact, there is no mention in any medical record of plaintiff's pain being either excruciating or so bad that he gets physically sick, both allegations he made during the administrative hearing.

6.    *FUNCTIONAL RESTRICTIONS*

No doctor has ever limited any of plaintiff's activities due to any of his impairments.

B.    *CREDIBILITY CONCLUSION*

In addition to the above, I note that plaintiff worked in Montana as a supervisor of migrant farm workers, but he failed to mention that in his administrative paperwork.[19]  He told Dr. Kreymer that he had been married four times, but in his disability application he listed two marriages -- his current one and one previous marriage.  He testified that he broke his right foot when he fell in September 2008; however, his foot x-rays were all normal after that fall. He testified that the fall tore up his lower back; however, no acute changes were observed on any test after his fall.  Plaintiff testified that episodes of high blood pressure cause chest pains, dizziness, bad headaches, and sweats.  However, when he went to the emergency room due to high blood pressure, he denied all physical symptoms on some occasions and on others he denied all physical symptoms except some minor chest tightness or a mild headache.  Plaintiff told his doctor in Montana that he had a past cervical fracture, but there is no evidence of a cervical fracture in any of the medical records.  In January 2009 plaintiff said he was not having back pain and at the time he was not taking any medication, and his physical exam was normal.  Plaintiff had normal range of motion after his fall in September 2008, and he had

---

[19]Plaintiff argues this is irrelevant because such a "lie" did not benefit plaintiff.  That argument is irrelevant -- the ALJ is only required to list reasons why he finds plaintiff's testimony not credible.  Previous inconsistencies in plaintiff's reports to doctors or to SSA are relevant to the credibility determination regardless of whether the "lie" was beneficial to the claimant.

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 44 of 52

normal neck range of motion in April 2011 -- more than 2 1/2 years after his alleged onset date. Plaintiff had long breaks in treatment, including an 18-month period after his alleged onset date when he saw no medical professional. Plaintiff's claim that he was unable to get medical care due to lack of funds is contradicted by his ability to secure cigarettes and alcohol, both for daily consumption.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not entirely credible.

## VII.     OPINIONS OF DR. ROSTON AND DR. KREYMER

Plaintiff argues that the ALJ erred in discrediting the opinions of Dr. Roston -- who signed off on the Medical Source Statement (Physical) that was completed by Nurse Sheila Wyman -- and of Dr. Kreymer who completed a Medical Source Statement (Mental) and two reports, both in connection with applications for government benefits as opposed to treatment.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).

The ALJ did not address Dr. Roston, but had this to say about Nurse Sheila Wyman:

> The claimant's record also contains a "Medical Source Statement (Physical)", which was completed by Ms. Sheila Wyman, a family nurse practitioner at the Forsyth Family Medical Clinic. . . . To begin with, the undersigned finds that Nurse Wyman is not an accepted medical source. Additionally, for the reasons delineated herein above, her assessment is inconsistent with [and] unsupported by the medical evidence of record, when considered as a whole. Accordingly, little weight is afforded to Nurse Wyman's assessment.

(Tr. at 16-17).

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 45 of 52

Although the form does appear to have been signed by Dr. Roston as well as Ms. Wyman, the result is still the same. It is undisputed that Ms. Wyman completed this form and then Dr. Roston signed it. However, Ms. Wyman's medical records very explicitly indicate that plaintiff's disability paperwork was *filled out based on patient's perception of abilities* (Tr. at 406) (emphasis added). Because the ALJ properly found plaintiff not credible, any medical opinion that was based exclusively on plaintiff's perception of his own abilities deserves no weight.

Aside from the above, I note that the opinion expressed in this Medical Source Statement is not supported by anything in the record and contradicts not only the medical record but plaintiff's own allegations. Next to the finding that plaintiff can sit for six hours per day was written the following: "4 hrs competitive, 2 hrs noncompetitive, this is on a good day. Some days are worse." The opinion also states that plaintiff needs to lie down every four hours for an hour at a time due to pain.

During the hearing, plaintiff was asked whether he could sit and stand all day long, and he said, "Well, that's what I do." It was not until he was asked about a need to lie down that he testified about that, and even then he said that "sometimes" he stretches out if his feet start swelling, and then it would be for 30 to 40 minutes. There is not one complaint of swollen feet in any of plaintiff's medical records. There is not one observation of swollen feet in any of plaintiff's medical records. Therefore, the record does not support a finding that plaintiff's need to "stretch out" due to swollen feet occurs often, if at all. Additionally, his own testimony is that he does this for 30 to 40 minutes "sometimes" due to swelling, not that he needs to lie down every four hours for an hour at a time for pain. There is nothing in any record of Dr. Roston or Nurse Wyman about a need to lie down, neither as a complaint nor as a recommendation.

46

The ALJ properly gave no weight to this Medical Source Statement (Physical).

The ALJ had this to say about Dr. Kreymer:

Following the psychological evaluation on September 30, 2010, Dr. Kreymer completed a Medical Source Statement (Mental), which indicated that the claimant's mental impairments essentially rendered him incapable of performing most of the mental requirements of work-related activities. Dr. Kreymer reported that his evaluation was based on the clinical interview, mental statu[s] examination and review of records (as available), behavioral observations and brief history. The report noted that the claimant did not provide any records from a hospital or physician. What the claimant brought [was] hand written, wherein he detailed his complaints, both mental and physical. In as much as the claimant did not provide any medical records from professional treating sources, the undersigned find[s] that Dr. Kreymer['s] assessment appears to be based primarily on the claimant's subjective complaints and his behavior during the [examination.] For example, during the psychological evaluations the claimant seems to make a big deal out of allegations of isolating himself as therapy for his mental problem. He emphasized that he does not get along with others, suggesting that he is verbally abus[ive] toward others and that he conceivably could become physically abusive under certain circumstances. Therefore, he takes great pains in isolating himself from others, going so far as to stay "in the woods" for a lengthy period of time. Nevertheless, when he completed a Function Report - Adult on March 1, 2010, he reported that his friend, Jimmy Tate, comes and pick[s him] up and they go to his house and visit most of the day. If he needs to go to town or to his mom's house, Jimmy takes him. The claimant also reported that [he] spends time with others by visiting, fishing and watching television, as well as eating with his friends at their house. He stated that he has no problems getting along with family, friends, neighbors and other people. The claimant also noted that he has never been fired from a job because of not getting along with other people. . . .

The undersigned finds that Dr. Kreymer's [opinion] did not have sufficient independent medical evidence upon which to base his assessment. There was no medical evidence provided by the claimant from any treating source to substantiate his subjective allegations. Hence, the undersigned finds that Dr. Kreymer's assessment is based for the most part on the claimant's subjective complaints. In view of the claimant['s] lack of credibility, as pointed out herein, the undersigned find[s] the claimant's subjective complaints to be self-serving and inconsistent with the earlier statements he made and the evidence of record when considered in its entirety. Accordingly, the undersigned grants little weight [to] Dr. Kreymer's assessment.

(Tr. at 15-16).

As mentioned above, Dr. Kreymer is not a treating physician. However, a physician's

opinion may be properly discounted when the conclusions are based on a claimant's subjective

complaints, particularly when the claims are found to be not wholly credible. Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996).

Dr. Kreymer's opinion regarding plaintiff's limitations was not consistent with his own mental status examination results. During the initial examination, Dr. Kreymer found that plaintiff was alert and oriented, with direct eye contact, appropriate behavior, good hygiene, and intact comprehension. Plaintiff's speech was coherent and goal-directed, and he was able to understand questions. Although plaintiff reported that he was angry and isolated himself, Dr. Kreymer observed that plaintiff could communicate well and related well on a one-to-one basis. He did not observe any evidence of plaintiff's alleged "anger" or inability to function while around other people. Dr. Kreymer's Medical Source Statement (Mental) was completed after this first evaluation, not after the second.

Dr. Kreymer's findings in his subsequent evaluation were generally consistent with the findings from the initial evaluation, though he did observe several improvements: plaintiff was "more engaging" than he had been at the prior evaluation, he was more open, more agreeable, he had a full range of affect whereas before his affect had been blunted, he was more cooperative, he had a higher level of intellectual functioning (Dr. Kreymer determined that he had not assessed it properly at the first evaluation), and plaintiff said that his bad dreams had abated. Dr. Kreymer noted that plaintiff's cognitive and executive skills were intact and he could communicate well. Plaintiff did not want to attempt mental concentration tasks, his motivation was poor, and despite Dr. Kreymer's earlier recommendations, plaintiff had still not sought out any treatment or other means of coping with his alleged depression, anger, and anxiety (none of which was observed by Dr. Kreymer).

After testing, Dr. Kreymer found that plaintiff's memory was normal. He noted that plaintiff was easy to engage, he continued to demonstrate the ability to follow directions, he

48

gave marginal effort, and "he has expressed no interest in employment at this time." These observations are entirely inconsistent with Dr. Kreymer's findings in the Medical Source Statement (Mental).

The findings at issue in this Medical Source Statement are the "markedly limited" and "extremely markedly limited" abilities, as follows:

o   The ability to maintain attention and concentration for extended periods

o   The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

o   The ability to sustain an ordinary routine without special supervision

o   The ability to work in coordination with or proximity to others without being distracted by them

o   The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

o   The ability to interact appropriately with the general public

o   The ability to ask simple questions or request assistance

o   The ability to accept instructions and respond appropriately to criticism from supervisors

o   The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

o   The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

o   The ability to respond appropriately to changes in the work setting

o   The ability to travel in unfamiliar places or use public transportation

49

There is simply no evidence to support such limited findings. Although plaintiff argues that the ALJ "merely rejected Dr. Kreymer's MSS-M, with the inane justification that Plaintiff did not provide Dr. Kreymer with 'sufficient independent medical evidence upon which to base his assessment' and that there 'was no medical evidence provided by the claimant from any treating source to substantiate his subjective allegations'", I note that Dr. Kreymer's conclusions in the Medical Source Statement (Mental) border on ridiculous given his observations and findings (for example, finding that plaintiff is "markedly limited" in his ability to adhere to basic standards of neatness and cleanliness when Dr. Kreymer observed that plaintiff was clean with appropriate appearance and good hygiene).

It is clear that Dr. Kreymer's evaluation was based entirely on plaintiff's subjective complaints, it is inconsistent with his own observations and testing, and as a result his opinion in the Medical Source Statement (Mental) is not deserving of any weight.

## VIII.  DEVELOPMENT OF THE RECORD

Plaintiff argues that the ALJ erred in failing to fully develop the record by not contacting Dr. Roston or Dr. Kreymer in order to determine these physicians' opinions as to plaintiff's ability to function.

The duty to develop the record arises when a "crucial issue is undeveloped" and the evidence is not sufficient to allow the ALJ to form an opinion. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). There is no indication in this case that the ALJ was confused by the evidence or was unable to make an assessment of plaintiff's residual functional capacity. Tellez v. Barnhart, 403 F.3d 953, 956-57 (8th Cir. 2005) ("there is no indication that the ALJ felt unable to make the assessment he did and his conclusion is supported by substantial evidence").

50

Plaintiff further alleges that because the ALJ dismissed the opinions of Dr. Roston and Dr. Kreymer, the residual functional capacity was concocted "out of thin air." But a residual functional capacity assessment is based on all the evidence of record, not just medical evidence. Although the residual functional capacity formulation is a part of the medical portion of a disability adjudication (as opposed to the vocational portion), it is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather an ALJ has the duty to formulate residual functional capacity based on all the relevant, credible evidence of record. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) ("[I]n evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively.") (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)); Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree."); see also 20 C.F.R. §§ 404.1545 and 416.945; SSR 96-8p.

In this case, the ALJ's decision includes a discussion of plaintiff's medical treatment records, along with a summary of plaintiff's testimony, clearly indicating that such evidence was carefully considered.

In criticizing the ALJ's residual functional capacity assessment, plaintiff argues that the ALJ did not perform a proper function-by-function assessment. However, where all of the functions that the ALJ specifically addressed in the residual functional capacity assessment were those in which he found a limitation, a court can reasonably believe that those functions that he omitted were those that were not limited. Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003).

I find that the substantial evidence in the record supports the ALJ's residual functional capacity assessment and that there was no need to further develop the record.

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 51 of 52

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 18, 2013

Case 6:12-cv-03033-REL   Document 18   Filed 03/18/13   Page 52 of 52